UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NIRANJAN LAL,

       Plaintiff,

v.

UNITED STATES LIFE INSURANCE
COMPANY,

       Defendant.

Case Number 05-0853
Honorable David M. Lawson

_____/

## OPINION

The plaintiff, Niranjan Lal, a medical doctor, brought an action against the defendant, United States Life Insurance Company (US Life), for breach of a disability insurance policy the defendant issued on a group basis through the American Medical Association. The complaint, originally filed in state court, alleges one count of breach of contract and one count of violation of the Michigan Uniform Trade Practices Act. The case was removed to federal court, and the matter proceeded to trial on June 5, 2006. Two witnesses testified in open court and three witnesses testified by deposition, and 15 exhibits were received in evidence. The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52, followed by its application of the governing law.

### I. Jurisdiction

The plaintiff alleges a claim under state law. The plaintiff is a citizen of the State of Michigan and the defendant is a New York corporation with its principal place of business in the State of New York. The amount in controversy exceeds the sum of $75,000 exclusive of costs and attorney fees. The Court has jurisdiction of the claims based on diversity of citizenship. 28 U.S.C. §§ 1332, 1441.

## II.  Findings of Fact

Plaintiff Niranjan Lal is a physician who has practiced medicine in Kalamazoo, Michigan since 1975.  He is board certified in internal medicine with a subspecialty in nephrology and hypertension disorders.  He has suffered from chronic calcific pancreatitis since the early 1970s, and his symptoms have waxed and waned over the years.

Lal is a member of the American Medical Association (AMA).  The AMA offered a group disability policy to its members, which is underwritten by defendant US Life.  Lal was issued a certificate of coverage under AMA Group Policy G-189,553.  Lal's certificate number 2313963 became effective on August 31, 1983.

The policy states that US Life will pay income replacement benefits to an insured person who becomes totally disabled while the insurance coverage is in force, following an elimination period.  Def.'s Ex. 5 at 28.  The policy states that coverage ends (among other reasons)

> upon the suspension or revocation in any state of your license to practice medicine as a result of a criminal act, ethical violation, or gross malpractice; or upon your surrender of your license to practice medicine in any state prior to, during, or in lieu of any medical licensure board inquiry, investigation or other action  pertaining to a criminal act, ethical violation, or gross malpractice.

*Id.* at 27.  In 1997, the Board of Medicine Disciplinary Subcommittee of the Michigan Department of Consumer & Industry Services filed an administrative complaint against Dr. Lal for writing prescriptions to dispense narcotic drugs absent a lawful therapeutic purpose, and it issued an order of summary suspension of his license to practice medicine on March 27, 1997, which became effective when it was served on Dr. Lal on March 31, 1997.  That suspension was stayed the same day by the Kalamazoo County, Michigan circuit court.  Lal was convicted of criminal charges stemming from this complaint on March 17, 1999.  The State of Michigan issued a final order suspending Dr. Lal's license to practice medicine for six months plus one day on January 17, 2003,

which became effective on February 16, 2003.  His license was restored by an order of the medical

licensing board on October 9, 2003.

Dr. Lal filed a claim for disability benefits under the US Life policy on September 5, 2003

alleging that he was totally disabled from his increasingly severe symptoms of chronic pancreatitis

as of February 4, 2003.   US Life denied the claim in part because it believed that coverage

terminated under the terms of the policy when the State of Michigan issued its order of summary

suspension in 1997, well before the alleged onset of disability.  The parties filed cross motions for

summary judgment on the issue of the policy's termination date, and on December 7, 2006, the

Honorable Gordon J. Quist, to whom this case was assigned before it was transferred to the

undersigned, held that the Michigan circuit court's stay order undid the summary suspension and

restored the *status quo ante*, and Dr. Lal's license was not suspended – and coverage did not

terminate – until February 16, 2003.  The issue presented for trial, therefore, is whether Dr. Lal

became "disabled" as that term is defined in US Life's policy prior to February 16, 2003.

The policy contains the following definition of "total disability":

TOTALLY DISABLED or TOTAL DISABILITY means:
. . . your complete inability to perform the substantial and material duties of your
Current Occupation, and not engaged in any other occupation.
. . .
The Total Disability must be a result of an Injury or Sickness and must begin while
insured under the group policy.  To be considered totally disabled, you must also be
under the Regular Care and Attendance of an Attending Physician.

REGULAR CARE AND ATTENDANCE means observation and treatment to the
extent necessary under existing standards of medical practice for the condition
causing Disability.

Def.'s Ex. 5 at 28.

The plaintiff contends that he met the definition of disability while coverage was in effect

because the symptoms of his chronic pancreatitis became exacerbated to the point where he had to

-3-

take narcotic pain medication, which rendered him unable to practice medicine, and he had been seeing Dr. Michelle Anderson for this condition since the fall of 2001 and was under her care.  The defendant argues that Dr. Lal was not so sick that he could not practice his medical specialty, and he was not under the regular care of a physician for his chronic pancreatitis because there was a lengthy hiatus in his treatment with Dr. Anderson, whom he did not see after the alleged disability onset date until March 25, 2003.

Dr. Lal testified at trial that after graduating medical school in India, he came to the United States for a his residency in Detroit and completed a fellowship in nephrology in Miami, Florida in 1973.  He said that his practice treating kidney ailments and hypertension typically involved office visits and hospital rounds, although he concentrated his work more on hypertension disorders for the last ten years of his practice.  His typical day started at the hospital in the morning, followed by office visits beginning at approximately 10:00 a.m., and he saw patients throughout the day and into the evening.

Pancreatitis apparently has been a recurring problem for Dr. Lal all his life.  He stated that when he was young he had serious bouts every three to six months that rendered him bedridden for three to four days.  These attacks were triggered by certain foods, which he learned to avoid.  He was first diagnosed with pancreatitis in 1973 when he was on his fellowship in Miami.  He was admitted to a hospital where an endoscopic procedure – known as an endoscopic retrograde cholangiopancreatography (ERCP) – was performed to open the common bile duct.  In 1976, he was admitted to a hospital in Boston where another ERCP was performed, and he had a ten-day hospital stay.  Apparently there were complications associated with that procedure.

Dr. Lal testified that he managed his chronic pancreatitis before 1973 without the help of medications, and afterward he took some drugs as needed for pain, plus bed rest and alteration of

his diet. When an attack recurs – which happens at unpredictable times – his symptoms include intractable stomach pain, left-sided headache, numbness in arms and legs, nausea, and vomiting. Currently he takes a variety of medications to assist in digestion and control of pain. He says that he has been taking Vicodin daily for pain since February 2003. His pancreatitis has caused other complications, which now include diabetes diagnosed about ten years ago and diabetic neuropathy diagnosed about three years ago.

In 1999, 2000, and 2001, Dr. Lal suffered attacks that sent him to the emergency room at hospitals in North Carolina and western Michigan. He was given pain medication, including Vicodin, and sent home. He testified that his symptoms worsened in 2000, when he decided to seek treatment from Dr. Michelle Anderson, a pancreas specialist at the University of Michigan hospitals. Dr. Anderson saw him in 2001 two or three times and ordered medical tests. She changed his medication regime and added some additional pain medications. Sometime in 2001, Dr. Lal found that the side-effects of his medications caused drowsiness and fatigue, and he found it necessary to cut back on his practice to part time. He continued to work part time for almost two years before he stopped practicing medicine on February 4, 2003.

He last saw Dr. Anderson before he stopped working in September 2001; she had prescribed medications with prescription refills, which he says he continued to take. He was also seeing an internist, Dr. Liselle Douyon, since 2000. Dr. Douyon was managing the plaintiff's diabetes, which Dr. Anderson described as a complication of his chronic pancreatitis. He did not return to Dr. Anderson until March 2003, he says, because his chronic pancreatitis was under control during that time.

Dr. Lal testified that his fatigue began to worsen in January 2003. He said he had trouble even walking from his car to his office, and he asked his wife to start driving him to work. In the

beginning of February 2003, he stayed home, cancelled his office appointments (as shown by his office calendar), took more pain medication, including Tylenol and Vicodin, and put himself on a liquid diet.  He anticipated returning to work the following week, but he was unable.  He said that to control the pain, he would start with Tylenol, then take Vicodin when the non-narcotic proved ineffective; but he found himself taking the narcotic drug one to three times each day.

The plaintiff also called to make an appointment with Dr. Anderson that month, but he found that her schedule would not allow him to be seen until March 25, 2003, when he did see her.  Dr. Lal said he took the first appointment he could get.  He also made an appointment with his internist, Dr. Douyon.

Dr. Lal acknowledged that in January 2003, he was notified that administrative proceedings that had been pending since 1997 were concluding with the result that his medical license would be suspended.  He said that he believed he could obtain an extension on the commencement date of the suspension through April, but it was not to be.  Dr. Lal also acknowledges that he did not tell Dr. Anderson of his licensure troubles in March 2003 when he saw her; he explains that he believed that he might win reconsideration, but was not told of the denial until April of that year.

The plaintiff explained that he did not apply for disability benefits under his policy with US Life until September 5, 2003 because he believed his condition would improve and he could return to work.  However, due to complications from the pancreatitis, he underwent another ERCP in August and had his gall bladder removed.

Dr. Lal testified that he is unable to practice medicine because of the symptoms and effects of his chronic pancreatitis complicated by the side-effects of his pain medication.  He says he feels pain, drowsiness, fatigue, and "fuzziness in the head"; he must take Bentyl, Pamelor, and Vicodin to help absorb nutrients, compensate for his pancreatic insufficiency, and control his pain.  The

medications then cause more drowsiness and fatigue.  He has been receiving benefits from two other disability insurance companies and the Social Security Administration, but he says that he received more income working part time than from all these alternate sources combined.

Dr. Anderson testified that her prescription orders generally did not permit refills after one year.  Dr. Lal maintained that he continued to take medications prescribed by Dr. Anderson beyond the one-year anniversary of his last visit with her in September 2001.  The prescription records in the claim file indicate that Dr. Lal obtained refills of medications that ostensibly are intended to treat pancreatitis through March 6, 2003, Def.'s Ex. 5 at 251, although it is unclear who was the prescribing physician, and the plaintiff apparently continued to visit Dr. Douyon during this time. Dr. Lal insisted that he never self-prescribed any medication, and there is no credible contrary evidence.

Dr. Michelle Anderson testified that she first saw the plaintiff in November 2000 and began treating him for chronic pancreatitis.  She recommended an ERCP, which Dr. Lal declined; started a course of medical therapy; and recommended a three-month return visit.  Dr. Lal next returned to see Dr. Anderson in March 2001.  She examined him, adjusted his medications, and recommended that he return in six months.  She also suggested he obtain some medical tests for pancreatic cancer before his next visit.  He complied, and returned next in September 2001.  Dr. Anderson noted at that time that the plaintiff had been under her care for almost a year, his symptoms during that time had waxed and waned, and he had of late been doing reasonable well until he succumbed to "dietary indiscretions."   She recommended he consider an ERCP and continue his medications.  She also recommended that he return in three months.

However, as noted above, the plaintiff did not see Dr. Anderson again until March 25, 2003. She remarked that she was surprised that he had waited so long before returning.  Nonetheless, she

testified that he was still under her care and stated that her clinic's policy is that a lapse in treatment of three years generally is required before a returning patient is considered "new."  She explained that she routinely sees patients on three- and six-month recalls, and if they are stable she schedules return visits for a year.  When pressed, Dr. Anderson testified that a 1-½-year gap in treatment is "pretty close" to interrupting her regular care of a patient.  But she maintained that Dr. Lal was under her regular care when he returned to see her in March 2003 and she considered him to be her patient for the entire period.

Dr. Anderson also explained that she will not prescribe medications for patients she had not seen for a year.  However, she also confirmed that she writes prescriptions for non-narcotic medications, including pain medication, with refills that will last for a year that the patient could continue to take beyond the one-year period.

The plaintiff's pancreatitis is well documented.  He had physical findings on imaging studies that showed scarring, which Dr. Anderson referred to as calcifications.  She explained that the pancreas sits on top of the celiac plexus, which is a bundle of nerve tissue, and when the pancreas becomes inflamed it causes excruciating abdominal pain.  Pain also is caused by dilation of the pancreatic duct.  In addition, gall stones that obstruct the common bile duct can prevent drainage of the pancreatic duct and cause pain.  In Dr. Lal's case, imaging studies from the spring of 2003 showed  gallstones in the gall bladder, stones in the bile duct, dilation in the pancreatic duct, and possibly stones in the pancreatic duct as well.  Later that year, Dr. Lal underwent another ERCP and had his gallbladder removed.

Dr. Anderson found that Dr. Lal was disabled from practicing medicine as of February 4, 2003 when he stopped working due to pain from his chronic pancreatitis that required him to take narcotic pain medication.  She said that use of narcotic drugs impairs a physician's ability to make

good judgments.  She did not believe that there was any work he could do as a physician given his condition.  Dr. Anderson acknowledged that she was not informed of Dr. Lal's licensing difficulties when she made her initial statement to US Life representatives that his disability onset date was February 4, 2003.  However, she was aware of all the circumstances when she testified in her trial deposition, and she did not change her opinion.  She noted that the plaintiff contacted her office sometime in mid-February 2003 or earlier to schedule a return visit and he came as soon as her schedule permitted.

Dr. Mark Friedman, the defendant's expert, was quite suspicious of the plaintiff's claim of disability and believed that his complaints of disabling pain are referable to secondary gain.  Dr. Friedman is board certified in internal medicine, practices medicine half-time, and devotes the remainder of his professional time to conducting record reviews for insurance companies and state agencies in disability cases.  He did not examine the plaintiff in this case but he did review his medical records and read Dr. Anderson's discovery deposition.  He said that in treating chronic pancreatitis, usually a primary care physician would work with a subspecialist in pancreatic diseases, which apparently was the relationship between Dr. Douyon and Dr. Anderson in this case.  He believed that the 1-½-year treatment gap disqualified the plaintiff from claiming that he was under the "regular care" of Dr. Anderson within the meaning of the insurance policy in this case.  He also believed that a person claiming disability due to pain might be able to perform sedentary work.  Although he acknowledged that taking Vicodin might impair the plaintiff from working as a physician – he said it is a "tricky question" – he believed that Vicodin does not cause impairment when taken in an appropriate amount.

Dr. Friedman concluded that Dr. Lal's use of narcotic pain medication is not disabling.  His opinion is tinged with skepticism arising from Dr. Lal's licensing problems coupled with the

plaintiff's failure to disclose them to Dr. Anderson in March 2003.  He discounts Dr. Anderson's opinion because it was based on limited information, that is, lack of knowledge of the license suspension.  He also testified that she incorrectly accepted the history Dr. Lal gave to her about the disability onset date, and he believes that she could not accurately project the plaintiff's condition back over the seven weeks from the March 25, 2003 visit to when he stopped working.  Dr. Friedman also criticizes Dr. Anderson for finding that the plaintiff is disabled from a chronic condition after seeing him only one time.  He believed that chronic pancreatitis is a disease that "burns itself out" so that it is "a bit of a leap of the imagination" to conclude that it can be permanently disabling.  Friedman dep. at 70.

The defendant's other witnesses – Laura Parker and George Ashmore – testified to the claims-handling procedures and their interpretation of the policy conditions.  Neither had any direct contact with the plaintiff, and they were not involved with the case until after the initial denial of the claim.

The Court concludes that the plaintiff became unable to perform work as a physician as of February 4, 2003.  There is no dispute that he stopped working as of that date: he cancelled his appointments with patients that had been scheduled and has not returned to practice medicine since. The cessation of his practice at that time was not due to the suspension of his license, which was still in force and has since been restored.

The Court finds the plaintiff's complaints of disabling pain to be fully credible.  He had a well-documented history of chronic calcific pancreatitis, and the pain he described is consistent with the symptoms Dr. Anderson stated were typical of the disease.  In addition, objective medical tests showed that the plaintiff had developed gallstones and obstructions that would cause the pain he described.  There is no evidence in this case that the formulation of gallstones is an event that

happens suddenly, and it is likely that the physical findings reported by Dr. Anderson at the March 25, 2003 examination had existed from the time that the plaintiff reported an increase in the severity of his pain that caused him to begin taking narcotic pain medication that he had on hand from previous prescriptions and discontinue working.  Dr. Lal also eventually underwent two invasive procedures to address these problems.  One, a third ERCP, was a procedure with which he had a prior bad experience and put off in favor of more conservative care, which suggests to the Court that his condition had worsened to the point that he had to turn to therapy that he earlier tried to avoid. That conduct does not support an inference that he was overstating his pain symptoms.

Dr. Friedman did not believe that ingestion of Vicodin would disable Dr. Lal from performing his duties as a physician.  However, Dr. Friedman qualified his opinion with the statement that a patient must take the drug in a "reasonable amount" to relieve pain.  He expressed the view that it is the reason one takes narcotic pain medication (i.e whether one takes the medication to "get high" or to alleviate pain), not the effect of the medication, that causes disability. That opinion makes little sense, however, when one considers the patient who must take large doses of pain medication to address his individual symptoms.  The outcome manifested by physical reaction to the medication is the same regardless of the motive.  And the determination of a "reasonable amount" of pain medication for legitimate therapeutic purposes is difficult to make without an examination of the patient.

The Court does not share Dr. Friedman's skepticism of the plaintiff's complaints of disabling pain. Dr. Lal's license suspension was not a career-ending event.  He testified that the income he would receive from his disability insurance policy, even when combined with other disability income he is receiving, would not exceed his earnings from his part-time medical practice.  This evidence stands uncontradicted in the record.  Dr. Lal also testified that he enjoyed practicing

medicine, and it is not reasonable to infer that he is exaggerating his pain symptoms for the purpose of recovering on his disability policy. The Court also rejects Dr. Friedman's criticism of Dr. Anderson's opinions. When Dr. Anderson gave her trial deposition, she had complete records and was fully informed of the plaintiff's social and personal history. She had been treating the patient since November 2001 and had the benefit of physically examining him, which Dr. Friedman had not. She is more qualified than Dr. Friedman to discuss the symptoms, treatment, and progression of pancreatic disease, and she had the benefit of a longitudinal picture of the patient's condition informed by personal contact with the plaintiff, which Dr. Friedman lacked. She also had no financial interest in testifying or expressing her opinion.

The Court, therefore, accepts Dr. Anderson's testimony as to the plaintiff's physical condition, rejects Dr. Friedman's testimony, and finds that the plaintiff was unable to perform the substantial and material duties of any gainful job as a physician as of February 4, 2003 due to chronic pancreatitis.

### III.  Conclusions of Law

### A.  Liability

The insurance policy states that it "is issued in and governed by the laws of Illinois." Def.'s Ex. 5 at 2. The parties agree that Illinois law supplies the rules for decision on the breach of contract claim. Under Illinois law, disability insurance policies "are subject to the same rules of construction applicable to other types of contracts." *Morgan v. CUNA Mut. Ins. Soc'y*, 242 Ill. App. 3d 1027, 1028-29, 611 N.E.2d 112, 114 (1993) (citing *Int'l Minerals and Chem. Corp. v. Liberty Mut. Ins. Co.*, 168 Ill. App. 3d 361, 119 Ill. Dec. 96, 522 N.E.2d 758 (1988)). Therefore, unambiguous terms need not be construed, *Becker v. Country Mut. Ins. Co.*, 158 Ill. App. 3d 63, 110 Ill. Dec. 285, 510 N.E.2d 1316 (1987), and the words in the policy are to be given their ordinary meaning. *Northbrook*

*Nat'l Ins. Co. v. Nehoc Adver. Serv., Inc.*, 196 Ill. App. 3d 448, 143 Ill. Dec. 316, 554 N.E.2d 251 (1989).

In order to recover benefits, an insured must comply with the contractual limitations and requirements. *Smagala v. Owen*, 307 Ill. App. 3d 213, 218, 717 N.E.2d 491, 496 (1999). In this case, the requirements in the insurance policy issued by US Life for recovering income replacement benefits are that the policy is in force, the claimant becomes completely unable to perform the substantial and material obligations of his current occupation, the disability is due to a sickness or injury that began while the insurance was in force, and the claimant is under the care and attendance of an attending physician.

According to Judge Quist's opinion adjudicating cross motions for summary judgment, the insurance policy was in force from 1983 through February 16, 2003. The Court has found as a matter of fact that the plaintiff could not perform the duties of his job as a physician due to chronic pancreatitis as of February 4, 2003. The remaining question is whether the plaintiff was under "the Regular Care and Attendance of an Attending Physician." Def.'s Ex. 5 at 10.

The policy states:

REGULAR CARE AND ATTENDANCE means observation and treatment under existing standards of medical practice for the condition causing Disability.

*Ibid.* The parties do not dispute that Dr. Anderson met the policy definition of attending physician. It also appear to be uncontested that Dr. Lal was under Dr. Anderson's regular care in the 2000 through 2001 time frame, and after March 25, 2003. Dr. Anderson testified that her care was continuous for the whole period. Dr. Friedman believed that treatment was interrupted.

In *Heller v. Equitable Life Assur. Soc'y of U.S.*, 833 F.2d 1253 (7th Cir. 1987), the court, applying Illinois law, considered a similar requirement in a physician's disability policy. The issue was whether the plaintiff, an invasive cardiologist who suffered from carpal tunnel syndrom, was

-13-

required to undergo elective surgery in order to meet a policy condition that stated, "the total

disability will not be considered to exist for any period during which the Insured is not under the

regular care and attendance of a physician." *Heller*, 833 F.2d at 1255. The court held that the

language did not require the insured to submit to surgery or any other particular course of treatment

recommended by his doctor. The court explained:

> We are convinced that under Illinois law the clause "under the regular care and attendance" means just what it says, namely, that the insured is obligated to periodically consult and be examined by his or her treating physician at intervals to be determined by the physician. Clearly the language does not condition disability payments on the insured's undergoing surgery if recommended by the physician rendering "regular care and [in] attendance." We refuse to indulge in judicial activism and condition coverage under the contract on the insured's undergoing surgery, when the insurer failed to provide such a conditional clause in the policy.
>
> The clause, "under the regular care and attendance of a physician," was not intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives. We are convinced that the purpose of the clause requiring the insured to be "under the regular care and attendance of a physician" is to determine that the claimant is actually disabled, *see, e.g., Russell v. Prudential Insurance Company of America*, 437 F.2d 602, 607 (5th Cir. 1971), is not malingering, and to prevent fraudulent claims.

*Id.* at 1257.

Applying the reasoning set forth above, it is apparent that the plaintiff was under the regular

care and attendance of Dr. Anderson for his chronic pancreatitis from November 2000 through the

present date (Dr. Anderson testified in her trial deposition that she had most recently seen the

plaintiff on April 27, 2007). The policy in this case makes reference to "existing standards of

medical practice" when considering regular care and attendance. Although Dr. Anderson would

have preferred that Dr. Lal undergo an ERCP procedure sooner than he did, and that he visit her

more frequently, she believed that under prevailing professional norms he was her patient

throughout the course of treatment beginning in November 2000, and he was under her regular care.

Dr. Anderson made the point in her testimony that since she puts stable patients on a one-year recall,

Dr. Lal arguably missed only one visit under her regime. That rationale may strain the facts, especially since her office note from September 7, 2001 states that she wanted to see him again in three months. But that does not diminish the fact that the plaintiff turned to Dr. Anderson for care and treatment of his pancreatic disease, and she found him to be under her regular care according to existing medical practice standards.

Moreover, the purpose of this qualifying clause has been met in this case. The plaintiff saw Dr. Anderson for his sickness both before and after the disability onset date; his chronic pancreatitis was a genuine condition, as confirmed by Dr. Anderson; his ailment was confirmed by objective testing; and it cannot be said that he attempted to advance a fraudulent claim, as evidenced by Dr. Anderson's findings.

The Court finds that all the necessary conditions under the disability policy have been met by Dr. Lal. The failure to pay benefits constitutes a breach of the insurance contract for which the defendant must answer in damages.

The plaintiff also claims that the defendant is liable under the Michigan Uniform Trade Practices Act. The relevant statutes state:

> (1) A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance . . . or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice *unless the claim is reasonably in dispute*.
> . . .
> (4) If benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insured or an individual or entity directly entitled to benefits under the insured's contract of insurance.

Mich. Comp. Laws § 500.2006(1), (4) (emphasis added). In order for the plaintiff to recover under this statute, he must prove that his claim was not "reasonably in dispute." *Fed. Ins. Co. v. Hartford*

*Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 499 (6th Cir. 2005).  "'The purpose of the penalty interest statute is to penalize insurers for dilatory practices in settling meritorious claims, not to compensate a plaintiff for delay in recovering benefits to which the plaintiff is ultimately determined to be entitled.'" *Ibid.* (quoting *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 233 Mich. App. 143, 148, 594 N.W.2d 74 (1998)).

In this case, the defendant denied the claim because it believed that Dr. Lal's disability policy terminated when the State issued an order of summary suspension in 1997.  At that time, the defendant refunded to the plaintiff the premium payments he had made after the license suspension date, even though the suspension was stayed.  The Court believes that the issue of the defendant's liability for the claim was reasonably in dispute until Judge Quist decided the matter in December of last year.  After that, there still existed a fact question whether Dr. Lal was totally disabled within the terms of the policy, including whether he was under the regular and attendance of a physician at the time.  The Court finds that those issues were reasonably in dispute as well.  *See All Am. Life and Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.*, 756 F.2d 474, 481-82 (6th Cir. 1985).

The Court concludes, therefore, that the plaintiff has not sustained his burden of proof on count two of the complaint brought under the Michigan Uniform Trade Practices Act.

### B.  Damages

The parties agree that if the defendant is liable under the policy, it is obliged to pay a monthly benefit to the plaintiff of $3,000 beginning 90 days after the disability onset date.  The elimination period prescribed by the policy is 90 days.  The disability date is February 4, 2003.  Payments should have been made starting May 4, 2003.  Fifty monthly payments are due and owing from May 4, 2003 through the present date, totaling $150,000.

The defendant also refunded premiums from March 27, 1997 to February 16, 2003 totaling $19,965.80. The plaintiff agrees that this amount should be offset against the payments due under the policy.

The plaintiff also is entitled to prejudgment interest under Michigan Compiled Laws section 600.6013. The amount of interest must be determined based on the applicable interest rate, *see* Mich. Comp. Laws § 600.6013(8), applied to the amount owing, which changes month by month. The plaintiff is not entitled to penalty interest for the reasons stated earlier.

### V. Conclusion

After consideration of the evidence, the parties' arguments, and the applicable law, and based on the findings of fact contained herein, the Court finds that defendant US Life has breached its disability insurance contract with the plaintiff. The Court also finds that the defendant did not violate the Michigan Uniform Trade Practices Act. The Court also finds that the plaintiff suffered damages in the amount of $150,000 through the present date, and the defendant is entitled to a set-off of $19,965.80.

Accordingly, it is **ORDERED** that the plaintiff may have judgment against the defendant, US Life Insurance Co., in the amount of $130,034.20, plus prejudgment interest.

It is further **ORDERED** that the plaintiff is entitled to a declaration that he is entitled to future payments in accordance with the terms of AMA Group Policy G-189,553 and certificate number 2313963.

It is further **ORDERED** that the parties shall submit their calculations of the amount of prejudgment interest they claim should be awarded on or before **July 20, 2007**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 12, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 12, 2007.

s/Felicia M. Moses
FELICIA M. MOSES